UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT E. WILLIAMS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 3:15 CV 478 |
| | ) |
| WARDEN[1], | ) |
| | ) |
| Respondent. | ) |

## OPINION and ORDER

Robert E. Williams, a prisoner without a lawyer, filed a habeas corpus petition challenging his conviction and 95-year sentence for murder with a habitual offender enhancement by the Marion Superior Court on September 30, 2011, under cause number 49G04-1003-MR-23231. (DE # 1.)

## I.   BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Williams's burden to rebut this presumption with clear and convincing evidence. *Id*. Williams does not dispute the Court of Appeals of Indiana's summary of facts underlying this case:

> On the morning of September 19, 2009, teacher Sandra Bartenbach failed to show up at the elementary school in Indianapolis where she worked. An assistant to the school principal, Kimberly Brown, went to Bartenbach's house to determine why she was not at school. Upon arriving at the house, Brown noticed that the front door was ajar and the rear sliding door also was open. Brown then decided to call 911. A police

---

[1] The Respondent's name was changed from Superintendent to Warden pursuant to Indiana Code § 11-8-2-7.

officer arrived on the scene and went into the house, where he discovered Bartenbach's lifeless body in a pool of blood in a bathroom. Bartenbach had been stabbed approximately twenty-five times.

Williams lived across the street from Bartenbach with his girlfriend, Sandra Emous, and Emous's parents. On September 20, 2009, police went to Emous's house after Williams became a person of interest in the investigation. Emous told a detective that Williams had gone with a cousin to Fort Wayne on the afternoon of September 19. Emous also told the detective that she was aware of Williams having been in Bartenbach's house only once, about a year and a half before, when he helped Bartenbach move a dresser into the house. Bartenbach's ex-husband confirmed that Williams had helped move furniture on that occasion. Williams submitted to an interview by police on September 21, 2009, in which he stated that he had been in the house on a few other occasions as well, in response to police questioning that falsely implied that his fingerprints had been found throughout the house.

Emous and Williams also told police that on the evening of September 18, 2009, they had stayed at home, except for going to a Meijer store at around 8:00 p.m. for approximately one hour. Ten months after this original statement, Emous told police that they also had gone to a Walmart store at about 1:00 a.m. on September 19, 2009. Records of a cell phone belonging to Emous, however, showed that the phone had been used during the evening of September 18th and early morning hours of September 19th at locations other than Emous's house, the Meijer store, or the Walmart store.

David Lucas of the Indianapolis–Marion County Crime Lab ("Crime Lab") swabbed various areas of Bartenbach's house where there appeared to be blood stains, as well as other areas where DNA from skin cells might be expected to be found. Included among the items that Lucas swabbed was the inside and outside of the front door doorknob, which he determined had blood on it. The entire doorknob itself was removed and taken to the Crime Lab. Lucas also attempted to lift fingerprints in various areas of the house, but no fingerprints matching Williams were recovered.

Judith Macechko, a serologist with the Crime Lab, examined most of the items or swabs that Lucas had collected to confirm whether any of them contained human blood or seminal material. She did not, however, test the front door doorknob for human blood because Lucas had already collected blood samples from it. Any items that she confirmed were blood were marked for further DNA testing; she found no seminal material. She

2

also swabbed the front doorknob for possible skin cell samples, which were marked for further DNA testing. Tonya Fishburn with the Crime Lab completed the DNA testing on the items submitted by Lucas and Macechko. Fishburn determined that blood from the front door doorknob collected by Lucas was Williams's, based on the DNA profile. Williams's DNA was not found in samples from other locations in the house.
On March 23, 2010, Williams was charged with the murder of Bartenbach, as well as Class A felony robbery. The State subsequently added a habitual offender allegation. Williams was already in the Marion County Jail on another charge before this date. Williams spoke with Emous on the phone several times, and they were recorded discussing whether Williams's DNA might be found in Bartenbach's house. Emous did some research on forensic DNA testing and told Williams that DNA could be left at a scene by sweating. Williams responded, "Nah I wasn't, wasn't none of that, ain't none of that going on." Ex. 195, 195(a).

Williams also told Emous what she should say to police, including "Just be like 'He was home with me he did not go nowhere. And he was at home with me and my family was home.'" Ex. 196, 196(a). When Emous told Williams that police wanted to question her mother, Williams told Emous that she needed to "lace mama up . . . ." Ex. 198, 198(a). Eventually, Williams was forbidden from speaking with Emous on the phone. Williams then enlisted a fellow inmate to make calls to Emous and pass along coded messages to her. The inmate believed the messages were intended to emphasize to Emous that she be consistent in her statements to police. Also, after it was revealed that Williams's DNA was found in a blood stain at Bartenbach's house, Emous told investigators for the first time that she recalled Williams having helped Bartenbach unload groceries at her house two days before the murder and that he had accidentally cut himself while doing so, causing his knee to bleed.
On April 4, 2011, the State filed a request that a video deposition of Macechko be scheduled to be used at trial in place of her live testimony. Specifically, the State asserted that Macechko would be unavailable to testify at trial because she had retired from the Crime Lab and moved to Cleveland, Ohio, to care for her gravely ill elderly mother. Williams objected to the request for a video deposition in lieu of Macechko's trial testimony. The trial court overruled this objection. On June 23, 2011, a deposition of Macechko was conducted using the internet video communication system known as Skype. Macechko was located in Cleveland along with a Marion County deputy prosecutor, a Cuyahoga County, Ohio, deputy prosecutor, and the lead police detective. Located in

a courtroom in Indianapolis were the trial judge, Williams, his attorney, another deputy prosecutor, and IT personnel.

Williams's jury trial was held on September 6–12, 2011. Williams objected to the State's use of Macechko's Skype deposition in lieu of her live testimony, and the trial court overruled the objection. The jury found Williams guilty of murder but not guilty of robbery and also found that he is a habitual offender. The trial court sentenced Williams to a term of sixty-five years for murder, enhanced by thirty years for the habitual offender finding, for a total sentence of ninety-five years executed.

*Williams v. State*, 970 N.E.2d 267 (Ind. Ct. App. 2012)(table); (DE # 9-5 at 2–6).

On direct appeal, Williams argued that the trial court abused its discretion when it determined that Judith Macechko was unavailable under Indiana Evidence Rule 804, and that the admission of her videotaped deposition at trial violated his right to meet the witnesses face to face under Article I, Section 13 of the Indiana Constitution. (DE # 9-3 at 9.) Williams also invoked the United States Constitution's Sixth Amendment Confrontation Clause for the first time in the body of his appellate brief. (DE # 9-3 at 15.) The Court of Appeals of Indiana addressed Williams's Sixth Amendment argument on the merits even though he had not raised it in the trial court and affirmed the trial court. *Williams v. State*, 970 N.E.2d 267 (Ind. Ct. App. 2012)(table); (DE # 9-5 at 2–6). Williams sought transfer to the Indiana Supreme Court, where he rephrased his argument to explicitly invoke the Sixth Amendment as follows:

> The trial court erred when it found a critical State witness unavailable under Evidence Rule 804 in violation of Defendant's right of confrontation under the Sixth Amendment of the United States Constitution and the procedure used to take her testimony for use at trial violated his right of confrontation under Article I, Section 13 of the Indiana Constitution and such error was not harmless[.]

4

(DE # 9-6 at 3.) On August 30, 2012, the Indiana Supreme Court denied transfer. *Williams v. State,* 974 N.E.2d 476 (Ind. 2012)(table).

Williams filed a petition for post-conviction relief on December 14, 2012, under cause number 49G04-1003-PC-023231. That petition was still pending when Williams filed his habeas petition in this court on October 13, 2015. (DE # 1.) After his habeas petition was filed here, Williams filed a motion in his post-conviction relief case asking to withdraw his petition, which the court granted on July 11, 2016.

In his habeas petition, Williams raises only one ground for relief which can be simplified as follows: that the trial court erred in permitting Macechko's deposition testimony to be admitted at trial in violation of the Sixth Amendment's confrontation clause, and thereby denied him a fair trial, and the Court of Appeals of Indiana erred when it found that any error on the part of the trial court was harmless. (DE # 1.)

## II.    PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). Respondent concedes that William has exhausted his claim but argues that it is procedurally defaulted.

There are two distinct ways in which a state prisoner can procedurally default a federal claim. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018). The first occurs in "cases where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements." *Id.* In those cases, "the state

5

court judgment rests on an independent and adequate state ground and principles of comity and federalism dictate against upending the state-court conviction." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016)(citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)).

The second type of procedural default "stems from the requirement that a state prisoner must exhaust his remedies in state court before seeking relief in federal court," which requires the petitioner include his claims in "one complete round of the State's established appellate review process." *Snow*, 880 F.3d at 864 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). This means "the petitioner must raise the issue at each and every level in the state court system." *Lewis*, 390 F.3d at 1025. A petitioner "who has exhausted his state court remedies without properly asserting his federal claim at each level of state review has procedurally defaulted that claim." *Id.* at 1026.

The Respondent argues that Williams has not fairly presented his claim to the State court because he did not raise the federal basis for his claim in the trial court.[2] Fair presentment is required to avoid a federal court overturning a state court ruling without the state court first having an opportunity to correct a constitutional error. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). "Where a court has in fact ruled on a claim, there is no possibility of friction between the state and federal court systems

---

[2] The Respondent also argues that Williams's claims are not cognizable to the extent he relies upon the Indiana Rules of Evidence or the Indiana Constitution. *See Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004)("[E]rrors of state law in and of themselves are not cognizable on habeas review."). While Williams references violations of the Indiana Rules of Evidence or the Indiana Constitution, his petition has appropriately focused on his assertion that his rights under the United States Constitution were violated. (DE # 1 at 4.).

caused by the unseemliness of a federal district court's overturning a state court conviction without the state court's having an opportunity to correct the constitutional violation in the first instance." *Sandgathe v. Maass*, 314 F.3d 371, 376–77 (9th Cir. 2002)(internal quotations, citations, and brackets omitted). *See also Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004)(Sixth Amendment claim was exhausted despite petitioner's failure to adequately present his federal claim where the state's appellate court decided the issue on the merits.) Here, the Court of Appeals of Indiana addressed the merits of Williams's Sixth Amendment claim despite his failure to invoke the Sixth Amendment in the trial court. And, Williams then presented that issue to the Indiana Supreme Court in his petition for transfer. Thus, the Indiana courts had a full opportunity to correct any error at the trial court level, and the claim is not procedurally defaulted.

## III. STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015)(quotation marks and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods*, 135 S.Ct. at 1376 (quotation marks and citations omitted).

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(quotation marks omitted).

## IV. ANALYSIS

Williams asserts that the trial court erred when it found that Macechko was unavailable for trial and allowed her deposition testimony to be admitted in violation of the Sixth Amendment's Confrontation Clause. The Court of Appeals of Indiana recognized that "[u]nder the Sixth Amendment, out-of-court testimonial statements by a witness who does not appear at trial are inadmissible unless the witness is unavailable

8

to testify and the defendant had a prior opportunity for cross-examination." *Williams v. State*, 970 N.E.2d 267 (Ind. Ct. App. 2012)(table)(citing *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 1365 (2004)). The Court of Appeals of Indiana further recognized that the burden of demonstrating the declarant's unavailability to testify at trial rests with the State. *Id.* (citing *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002). Again relying on *Garner*, the Court of Appeals noted that:

> In particular, the State must make a good faith effort to obtain a witness's attendance at trial, regardless of whether he or she is out-of-state at the time of trial. *Id.* "Even if there is only a remote possibility that an affirmative measure might produce the declarant at trial, the good faith obligation may demand effectuation." *Id.* at 724–25. "Reasonableness is the test that limits the extent of alternatives the State must exhaust." *Id.* at 725.

*Id.* After reviewing the facts of the case, the Court of Appeals of Indiana concluded that "this circumstance pushes to the very edge of the envelope as to whether Macechko truly was unavailable to testify at Williams's trial," but even if the State did not meet its burden, the error was harmless beyond a reasonable doubt. *Id.* The Court of Appeals of Indiana reasoned as follows:

> Possibly the most critical single piece of evidence against Williams was that a blood stain recovered from the front door doorknob of Bartenbach's house was from Williams, based on the DNA profile. It was Lucas who first noticed that stain, removed the doorknob from the door, and swabbed it for blood at the Crime Lab, and it was Fishburn who conducted the final DNA testing. Macechko's involvement in the handling of this item of evidence was slight. As indicated in her deposition testimony, at most, Macechko handled the doorknob during the course of the testing process and was involved in the chain of custody of the blood stain swabbed from it, but no more.

> Although the State bears a higher burden to establish the chain of custody of "fungible" evidence, including blood samples, the State need not establish a perfect chain of custody. *Troxell v. State,* 778 N.E.2d 811, 814 (Ind. 2002). The State need only give reasonable assurances that the evidence remained in an undisturbed condition. *Id.* "Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties." *Id.* In particular, the State need not present the testimony of every technician who handled a particular piece of evidence in order to establish an adequate chain of custody. *See Kennedy v. State,* 578 N.E.2d 633, 638–39 (Ind. 1991), *cert. denied.*
>
> Here, we are convinced the State could have laid an adequate chain of custody foundation for the introduction of Fishburn's testing results, finding Williams's DNA in a blood stain on Bartenbach's front door doorknob, based upon Fishburn's and Lucas's testimony. Macechko did not participate in either the original collection of this evidence, the determination that it should be subjected to DNA testing, or the ultimate DNA testing itself. We conclude that even if it was error to introduce Macechko's deposition into evidence, and we do not specifically decide that question, any such error was harmless beyond a reasonable doubt.

*Williams v. State*, 970 N.E.2d 267 (Ind. Ct. App. 2012); ECF 9-5 at 10–11.

Williams disagrees with the Court of Appeals of Indiana's determination that the error was harmless beyond a reasonable doubt. Williams asserts that, if Macechko's testimony had not been permitted, then none of the DNA evidence linking him to the crime scene would have been admissible. Williams further asserts that, without the DNA evidence, the remaining evidence would not have been sufficient to support a conviction beyond a reasonable doubt, and that the trial court's error had a substantial and injurious effect on the verdict.

The United States Supreme Court has determined that the Sixth Amendment's Confrontation Clause applies to "witnesses' against the accused—in other words, those

who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Furthermore, "Where testimonial evidence is at issue, … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. "[A] witness is not 'unavailable' for purposes of the . . . confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724 (1968). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)(quoting the concurring opinion in *California v. Green*, 399 U.S. 149, 189 (1970)).[3]

The Court of Appeals of Indiana conceded that the trial court's determination that Macechko was unavailable pushed the envelope, but it avoided determining whether the Sixth Amendment was violated and instead found that, even if there were a violation, it was harmless beyond a reasonable doubt. In reaching this decision, the Indiana Court of Appeals applied the correct standard. The United States Supreme Court held in *Chapman v. California* that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). *See also Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)("Since *Chapman*, we have repeatedly reaffirmed the

---

[3] While *Crawford* abrogated *Ohio v. Roberts* to the extent that it permitted an unavailable witnesses' testimony to be admitted as long as there was a judicial determination of reliability, the discussion regarding what constitutes unavailability remains relevant, and is consistent with both earlier and later Supreme Court precedent. *See California v. Green*, 399 U.S. 149, 189 (1970); *Hardy v. Cross*, 565 U.S. 490, 495 (2011).

11

principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.")

While the Court of Appeals of Indiana correctly identified *Chapman's* "harmless beyond a reasonable doubt" standard, on habeas review, this court applies a different test regardless of whether the Indiana Court of Appeals found that any error was harmless beyond a reasonable doubt. *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011). This court must determine whether the Sixth Amendment violation had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993)(quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of <u>constitutional error</u> in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*, *supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman*.

*Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)(citation omitted, emphasis added). In other words, while *Chapman* must be satisfied for a petitioner to obtain habeas relief, the *Chapman* analysis is subsumed by *Brecht's* actual prejudice rule, and this court need not separately apply each test. *See Richardson v. Griffin*, 866 F.3d 836, 844–45 (7th Cir. 2017).

Under *Brecht,* habeas relief is to be granted if this court "has so much as a 'grave doubt as to the harmlessness'" of a constitutional error. *Jones*, 635 F.3d at 1053 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 439 (1995)). Factors to consider include "the importance of the witness' testimony in the prosecution's case, whether the testimony

12

was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See also United States v. Adams*, 628 F.3d 407, 417 (7th Cir. 2010). This court, like the Court of Appeals of Indiana, presumes that the trial court's finding that Macechko was unavailable and that her deposition testimony could therefore be admitted violates the Confrontation Clause for purposes of this analysis. Accordingly, this court turns to whether the presumed Sixth Amendment violation had a substantial and injurious effect on the jury's verdict.

Here, Macechko's testimony was important not because she herself performed any tests that linked Williams to the crime scene, but because she handled much of the evidence collected at the scene and passed it on for DNA testing. Most of this evidence, however, did not link to Williams. She did, however, handle key samples from the front doorknob that were ultimately linked to Williams. She collected a possible skin cell sample from the front doorknob that was ultimately found to contain Williams's DNA, packaged it, and sent it on to DNA for testing. (Macechko Dep. at 16–18.) And, she tested possible blood samples collected by Lucas that were ultimately found to contain Williams's DNA, determined that the samples contained blood, repackaged them, and passed them on to DNA for testing. (Macechko Dep. at 34–38.) But, as to the samples that ultimately connected Williams to the crime scene, that is all she did.

13

Williams takes issue with the Court of Appeals of Indiana's statement that Macechko did not participate in the determination that the evidence should be subject to DNA testing. Here, Williams's point is well-taken. Macechko testified that "if there's body fluid staining, if there's an indication or identification of a body fluid stain then the sample is packaged in a coin envelope for transfer to DNA." (Macechko Dep. at 9.) But, if she does not find anything of serological value, the sample is repackaged, resealed, and returned to the evidence room, and no sample would be sent to DNA for further testing. (*Id.*) Williams's argument has no traction, however, because what matters here is not that she was the one that decided to pass the evidence on for DNA testing but that she did in fact pass it on for DNA testing.

Next, the court must consider what impact Macechko's testimony had on the verdict. It is clear that this court must do more than ask whether the remaining evidence was legally sufficient to sustain a finding of guilt. *See Jones*, 635 F.3d at 1053. Any prejudicial effect of allowing the evidence to be admitted must be considered. *Id.* But here, the testimony was not inherently prejudicial – it merely aided in establishing the chain of custody for skin and blood samples that were ultimately linked to Williams. Macechko did not know if she had actually collected any skin cells or not when she swabbed the doorknob – she merely packaged the potential skin cells for DNA to assess. And, Macechko did not know whose blood was present in the samples that David Lucas collected – she only determined that blood was present. Thus, while her testimony was important to the extent that it aided in establishing the chain of custody

of samples that ultimately linked Williams to the scene, it was not particularly important beyond that.

The more important question is whether the key testimony from Fishburn linking Williams to the blood and skin samples would have been admitted in the absence of Macechko's testimony. The Court of Appeals of Indiana determined that evidence of Williams's DNA in a blood sample Lucas collected from the front doorknob was some of the most critical evidence presented at trial, but that an adequate chain of custody could have been established even in the absence of Macechko's testimony. This court agrees. Lucas collected samples from the front door doorknob, Macechko handled the samples and tested them to determine that they in fact blood contained blood before sending it on for DNA testing, which was performed by Fishburn. (States Exs. 86, 87, 96, 97; Macechko's Dep. at 34-38; Trial Tr. at 188-89, 785-88.) As the Court of Appeals of Indiana noted, in Indiana, chain of custody need not be perfect so long as the government demonstrates that the evidence remains in substantially the same condition. *See Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002). A presumption of regularity applies when evidence is in police custody. *Id.* Furthermore, gaps in the chain of custody go to the weight of the evidence, not its admissibility. *Id.* The United States Constitution likewise does not mandate that every individual that handled evidence be present at trial to testify. *See Malendez-Diaz v. Massachusetts*, 557 U.S. 305, 335-36 (2009)("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of

the testing device, must appear in person as part of the prosecution's case.") Accordingly, evidence that the samples collected by Lucas and tested by Fishburn contained Williams's DNA would have been admissible without Macechko's testimony. Furthermore, Macechko's failure to testify would not have detracted significantly from the weight of this powerful evidence.

The skin sample is a different matter. It was collected by Macechko and neither Lucas nor Fishburn could have provided testimony about how the sample was collected. Therefore, without Macechko's testimony, evidence that the skin sample collected by Macechko contained Williams's DNA would not likely have been admitted. But, given that the blood sample would have been admitted without Macechko's testimony, the admission of evidence linking DNA in the skin cells that Macechko collected to Williams would not have had a substantial and injurious effect or influence on the jury's verdict. The DNA evidence linking blood to Williams was relevant because it placed Williams at the scene. Fishburn's testimony was that, in the absence of an identical twin, there was a one in one billion chance of the DNA found in the sample collected from the inside doorknob[4] belonging to someone other than Williams, and a one in four sextillion chance of the DNA found in the sample collected from the outside doorknob[5] belonging to someone other than Williams. (Trial Transcript at 786–88.) The

---

[4] While Fishburn testified that this sample contained blood, she could not determine if the source of the blood was Sandra Bartenbach or Williams. It may have been a mix of DNA from one individual's blood and the other individual's skin cells. (Trial Tr. at 786.)

[5] Fishburn testified that this sample contained Williams' blood. (Trial Tr. at 787-88.)

16

DNA evidence linking skin cells to Williams merely corroborated the powerful and admissible evidence that Williams's blood was found at the crime scene.

When the evidence of Williams's DNA found in the blood sample collected at the scene is considered with other evidence of guilt, it is hard to imagine how the lack of Macechko's testimony could have had a substantial and injurious effect on the jury's verdict. Williams and Emous offered varying accounts of their whereabouts on the night of Bartenbach's murder—all inconsistent with cell phone records. Phone calls recorded at the jail are also suggestive of guilt. In one of these calls, in response to learning that the police wanted to interview Emous' mother, Williams indicated that Emous needed to "lace mama up." (State's Exs. 198 and 198(a).) In another call, in response to Emous telling Williams that DNA could be left at a scene by sweating, Williams responds by saying "[n]ah I wasn't, wasn't none of that, ain't none of that going on." (State's Exs. 195 and 195(a).) And later, after Williams was banned from speaking with Emous, there was evidence that Williams directed another inmate, Michael Webb, to call Emous and relay coded messages which Webb believed were designed to emphasize the need for Emous to keep her story the same. (Trial Tr. at 513–33.) There were also varying explanations for why Williams's DNA might be found at the scene: a piece of furniture fell on him when he was helping move it (State's Exs. 195, 195(a)), he put some tile down in the bathroom for the victim (State's Exs. 196 and 196(a)), and he was helping the victim bring in groceries just two days before her death when he dropped a case of water and his knee bled (Trial Tr. at 470–71, 482). These all

17

point toward guilt. Not only was there plenty of other evidence to support a conviction, but—in light of the record as a whole—the presentation of Macechko's testimony and the admission of duplicative testimony regarding Williams's DNA being found in the skin sample that Macechko collected from the front door doorknob would not have had a substantial and injurious effect on the jury's verdict. This court does not have any doubt as to the harmlessness of the error.

Here, the Court of Appeals of Indiana's determination that any error in admitting Macechko's testimony was harmless was not only well within the possibility of disagreement between fair-minded jurists, but also correct. *See Harrington*, 562 U.S. at 101; *Woods*, 135 S.Ct. at 1376. This court has no doubt that the trial court's error, if any, did not have a substantial and injurious effect on the verdict. Therefore, Williams is not entitled to habeas relief on this ground.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion,

there is no basis for encouraging Williams to proceed further. Thus, a certificate of appealability must be denied.

## VI. CONCLUSION

For these reasons, the habeas petition (DE # 1) is **DISMISSED** and a certificate of appealability is **DENIED**.

**SO ORDERED.**

Date: March 18, 2019

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT